UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LANCELOT INVESTORS FUND, LP, )
LANCELOT INVESTMENT )
MANAGEMENT, LP, )
                                             )
         Plaintiffs, )
                                             )
v. )
                                             )   No. _____
                                             )
THOMAS JOSEPH PETTERS, THOUSAND )
LAKES, LLC, PETTERS COMPANY, INC., )
NATIONWIDE INTERNATIONAL )
RESOURCES, INC., ENCHANTED FAMILY )
BUYING COMPANY, LARRY REYNOLDS, )
MICHAEL CATAIN, DEANNA COLEMAN, )
& ROBERT WHITE, )
                                             )
        Defendants. )
                                             )

**COMPLAINT**
**DEMAND FOR JURY TRIAL**

Plaintiffs Lancelot Investors Fund, LP ("Lancelot") and its manager Lancelot Investment Management, LP ("Lancelot Management"), by their undersigned attorneys, and for their Complaint against defendants Thomas Joseph Petters ("PETTERS"), Thousand Lakes, LLC ("THOUSAND LAKES"), Petters Company, Inc. ("PCI"), Nationwide International Resources, Inc. ("NIR"), Enchanted Family Buying Company ("ENCHANTED"), Deanna Coleman ("COLEMAN"), Robert White ("WHITE"), Michael Catain ("CATAIN"), and Larry Reynolds ("REYNOLDS") (collectively, the "RICO DEFENDANTS"), state as follows.

## Nature of The Action

1. Since at least 2003, PETTERS and the other RICO DEFENDANTS have conspired to defraud Lancelot and, upon information and belief, approximately 20 other identified investors and investment groups out of more than $2 billion through what the Federal Bureau of Investigation has identified as a Ponzi scheme. Lancelot alone has lost in excess of $1 billion as a result of this fraud. PETTERS and others have already been charged criminally. Further, as reported in a sworn affidavit from the Federal Bureau of Investigation and a criminal complaint filed by the U.S. Attorney's Office (attached hereto and incorporated herein respectively as **Exhibit A** and **Exhibit B**), in recorded conversations with his co-conspirators, PETTERS has repeatedly admitted defrauding his investors, referred to his scheme as a "little paper manufacturing plant" because it involved the use of forged invoices and purchase orders to bilk investors out of billions of dollars, and talked of fleeing the country (before being arrested on October 3, 2008 by federal authorities).

2. To induce Lancelot to make the series of loans to THOUSAND LAKES that form the basis for the fraud, PETTERS made a series of misrepresentations that loan proceeds would be used to purchase discounted electronics merchandise for resale to big box retailers like Sam's Club and Costco in addition to producing supporting documents ostensibly from third-

parties. As represented by PETTERS and THOUSAND LAKES in the Loan Agreement and requests for loans, the transactions would be structured as follows:

- PCI would receive a multi-million dollar purchase order from a big box retailer confirming its intent to purchase particular electronics merchandise from PCI.

- PCI would then assign that purchase order to THOUSAND LAKES, a special purpose entity established by and affiliated with PCI to serve as Lancelot's borrower.

- THOUSAND LAKES would enter into a contract to purchase the merchandise from vendors like NIR and ENCHANTED that had obtained the merchandise from liquidating companies or closeouts at significantly reduced prices.

- Based on the representations contained in the requests for loans and supporting purchase orders and contracts, Lancelot would then fund a percentage of THOUSAND LAKES' purchase of the merchandise from NIR and ENCHANTED, often through direct payments to those entities. PCI or one of its affiliates would fund the remaining percentage of the purchase price directly through its operating capital.

- Prior to the funds being paid to NIR and ENCHANTED, they would issue a bill of sale confirming the sale of the merchandise to THOUSAND LAKES.

- The merchandise would then be picked up by the big box retailers from NIR and ENCHANTED's warehouses.

- The funds deposited into a depository account would be swept by Lancelot and applied to pay down or pay off THOUSAND LAKES' indebtedness to Lancelot. Any excess proceeds were returned to PCI.

- Because Lancelot had recorded a security interest in all assets of THOUSAND LAKES, they had a secured interest in the loan collateral, the electronics merchandise, as well as THOUSAND LAKES' accounts receivable from the big box retailers. In addition, PCI and PETTERS personally guaranteed the loan obligations of THOUSAND LAKES.

3. In reality, the purchase orders, invoices, and bills of sale evidencing the collateral for the loans from Lancelot were fabricated. There were no sales from PCI, THOUSAND LAKES, or their affiliates to big box retailers, and NIR and ENCHANTED, the "vendors," did not actually sell merchandise to PCI or THOUSAND LAKES. Rather, loan proceeds sent to NIR and ENCHANTED for the express purpose of financing the purchase of merchandise were funneled back to PCI and PETTERS, less a 5% "commission" taken by NIR, ENCHANTED, REYNOLDS, and CATAIN as part of the scheme. PETTERS structured some repayments to

3

Lancelot to perpetuate the scheme and used the remainder to fund his other businesses and extravagant lifestyle. By the time PETTERS and the other RICO DEFENDANTS' scheme was uncovered, the RICO Defendants had defrauded investors of more than $2 billion, including in excess of $1 billion from Lancelot alone.

4. Plaintiffs have brought this action to redress the fraud perpetrated by PETTERS and the remainder of the RICO DEFENDANTS and to recover the RICO DEFENDANTS' ill-gotten gains on behalf of Lancelot's investors.

**Parties**

5. Lancelot Management is a limited partnership with its principal place of business in Illinois. Lancelot Management manages Lancelot, an entity that provides financing for businesses throughout the United States.

6. Lancelot is a Delaware limited partnership with its principal place of business is in Illinois. None of its investors reside in the state of Minnesota.

7. PETTERS is a natural person who is domiciled in Wayzata, Minnesota.

8. Upon information and belief, COLEMAN – PCI's Vice President of Operations – is domiciled in Minnesota.

9. Upon information and belief, WHITE – a former PCI officer and current consultant to PCI – is domiciled in Minnesota.

10. PCI is a Minnesota company with its principal place of business in Minnesota.

11. Upon information and belief, REYNOLDS – a principal of NIR – is a natural person domiciled in Las Vegas, Nevada.

12. Upon information and belief, NIR is a California company with its principal place of business in California.

13. Upon information and belief, CATAIN – a principal of ENCHANTED – is an natural person domiciled in Mound, Minnesota.

14. ENCHANTED is a Minnesota corporation with its principal place of business in Excelsior, Minnesota.

15. THOUSAND LAKES is a Delaware limited liability company with its principal place of business in Minnesota. Its Members are PETTERS and WHITE. THOUSAND LAKES is a special purpose vehicle used by PCI and PETTERS for transactions with Lancelot.

## Jurisdiction and Venue

16. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 et. seq. ("RICO") because they arise under the laws of the United States and over the RICO DEFENDANTS under 18 U.S.C. § 1965(b). This Court also has supplemental jurisdiction over the additional parties and state law claims because the claims are integrally related to the RICO claims and form part of the same case or controversy under 28 U.S.C. § 1367.

17. Venue is proper pursuant to 28 U.S.C. § 1391(a)-(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. In addition, THOUSAND LAKES, PETTERS, and PCI consented to the jurisdiction and venue of this Court in the Loan Agreement and Guarantees (attached hereto and incorporated herein as **Exhibit C** and **Exhibits D** and **E**, respectively).

18. Venue is also proper pursuant to 18 U.S.C. § 1965(a)-(b) because defendants transact affairs in this district and the ends of justice require it.

## The Scheme to Defraud

19. In the mid-1990's, PCI, ENCHANTED, and NIR formed an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise engages in the business of buying and reselling merchandise such as electronics merchandise among themselves and to others in interstate commerce.

20. PETTERS and his co-conspirators operated and managed the Enterprise's affairs through a pattern of racketeering amounting to a multi-billion dollar Ponzi scheme.

21. The activities of PETTERS and his co-conspirators are detailed further in the Affidavit of Special Agent Timothy Bisswurm and the Criminal Complaint against PETTERS that are attached to and incorporated in this Complaint (attached hereto and incorporated herein as **Exhibit A** and **Exhibit B** respectively).

22. Lancelot or its predecessor-in-interest Granite Investors Fund, LP, ("Granite") agreed to make a series of purchase order Loans to THOUSAND LAKES pursuant to the Master Loan Agreement dated as of October 11, 2002, as supplemented and amended from time to time (the "Loan Agreement"). **(Exhibit C)** PCI and PETTERS personally guaranteed the Loans by executing the Guaranty Agreements. **(Exhibits D and E)** The Loan Agreement and Guaranty Agreements are attached to this complaint and incorporated as if fully set forth herein.

23. The Loans were extended by Lancelot for the sole purpose of financing payments by THOUSAND LAKES on invoices for merchandise being acquired for resale to big box electronics retailers. The Loan Agreement required THOUSAND LAKES to submit Requests for Loans to Lancelot that included certain representations and warranties regarding the purchase of merchandise from suppliers like NIR and ENCHANTED, as well as representations and

6

warranties regarding the resale of that merchandise to retailers like Sam's Club and Costco. The Loan Agreement further required THOUSAND LAKES to submit copies to Lancelot of the purchase orders and invoices from the supplier, as well as the purchase orders and invoices from the retailer.

24. The Loans were limited to a percentage of the cost of the merchandise that served as the collateral for the Loans, and the remainder was to be paid directly by PCI. THOUSAND LAKES granted Lancelot a first priority perfected security interest upon all of its assets, including the financed merchandise and its associated accounts receivable. In accordance with the Loan Documents, Lancelot recorded its security interest in all assets of THOUSAND LAKES.

25. Through the submission of falsified Requests for Loans and forged purchase orders and invoices, PETTERS and his co-conspirators induced Lancelot to loan in excess of $1 billion to THOUSAND LAKES, ostensibly secured by inventory and accounts receivable. In reality, there was no inventory or accounts receivable; the purchase orders and other documents in support of these transactions had been fabricated.

26. At the top of the Enterprise, Defendant PETTERS directed COLEMAN, WHITE, and other PCI employees to create fictitious documents such as purchase orders, invoices and bills of sale. PETTERS, COLEMAN, and WHITE provided these documents to current and potential lenders and investors, including Lancelot. These false documents made it appear as though THOUSAND LAKES was purchasing substantial goods and merchandise that would then be resold to retailers at a profit.

27. Specifically, WHITE was responsible for creating false purchase orders and invoices related to the fictitious sale of merchandise by THOUSAND LAKES to big box

7

electronics retailers such as BJ's Wholesale Club, Sam's Club, Costco, and others. COLEMAN created false purchase orders and invoices evidencing THOUSAND LAKES' purchase of merchandise from NIR and ENCHANTED to fill the fictitious orders of the big box stores. COLEMAN and WHITE were compensated by PETTERS and PCI for their role in the fraud.

28.  THOUSAND LAKES, acting through PETTERS, COLEMAN, and WHITE, submitted Requests for Loans to Lancelot in the form attached as **Exhibit C** to the Loan Agreement. THOUSAND LAKES falsely represented in the Requests for Loans that, among other things, the Loans were for the sole purpose of paying for merchandise being acquired as inventory for resale. THOUSAND LAKES also submitted fabricated NIR and ENCHANTED invoices, purchase orders, and bills of sale to Lancelot. In addition, they submitted to Lancelot fictitious purchase orders and invoices for the resale of that merchandise from THOUSAND LAKES to BJ's Wholesale Club, Sam's Club, Costco, and others. THOUSAND LAKES submitted these false documents related to the purchase and resale of merchandise through the mail and interstate wire communications, as predicate acts in violation of 18 U.S.C. § 1341.

29.  The following false documents allegedly evidencing the resale of merchandise, among others, were submitted to Lancelot through interstate mails and wires:

  (a)  Invoice number 45399 on or around May 1, 2008, which purported to represent an order for 2340 Hitachi Presentation projectors from BJ's Wholesale Club to THOUSAND LAKES in the amount of $5,164,236.00, dated March 12, 2008.

  (b)  Invoice number 45388 on or around April 2008, which purported to represent an order for Infocus projectors from BJ's Wholesale Club to THOUSAND LAKES in the amount of $4,074,862.50, dated March 13, 2008.

  (c)  Invoice number 45431 on or around May 7, 2008, which purported to represent an order for digital cameras from BJ's Wholesale Club to THOUSAND LAKES in the amount of $2,706,637.50, dated March 24, 2008.

30. None of the documents submitted to Lancelot by THOUSAND LAKES were genuine or represented an actual sale. In reliance on these representations, Lancelot loaned THOUSAND LAKES in excess of $1 billion on or around the dates reflected on the Requests for Loans.

31. Under the Loan Documents, Lancelot was permitted to pay Loan proceeds requested by THOUSAND LAKES directly to merchandise vendors NIR and ENCHANTED. In accordance with that provision, Lancelot often wired Loan funds directly to NIR and ENCHANTED, the second level of the Enterprise, as partial payment for the purchase orders that had been submitted to Lancelot.

32. PETTERS and his co-conspirators forged bills of sale purporting to confirm the purchase of merchandise.

33. In fact, no merchandise was purchased, re-sold, or otherwise changed hands despite PETTERS' representations. Rather than apply the funds advanced by Lancelot toward merchandise, LARRY REYNOLDS at NIR and MICHAEL CATAIN at ENCHANTED had agreements with PETTERS to send the funds to PETTERS and PCI, less a 5% "commission."

34. In taking this kickback and forwarding the fraudulently obtained funds to PETTERS, REYNOLDS and CATAIN knowingly transported fraudulently-taken money that exceeded $5,000 in value across state lines with fraudulent intent in violation of 18 U.S.C. §§ 2314-15.

35. After REYNOLDS and CATAIN wired Lancelot's funds back to PETTERS and PCI, PETTERS paid down some of the Loans to Lancelot directly through the mails and wires, ostensibly on behalf of BJ's Wholesale Club, Sam's Club, Costco, and other re-purchasers, in

order to conceal the fact that the purchase orders were fictitious and in order to perpetuate the fraudulent scheme to obtain additional funding from Lancelot. PETTERS used the remainder of the funds to enrich himself and fund his other companies.

36. PETTERS and the other RICO DEFENDANTS used the mail, Federal Express, and interstate wire communications in furtherance of the scheme by sending documents via mail and interstate commercial carrier, and communicating in interstate commerce via wire transfer, by email and telephone. Further examples of these predicate acts are described in Special Agent Bisswurm's Affidavit (**Exhibit A**) and the Criminal Complaint (**Exhibit B**).

37. These predicate acts have the same or similar purposes, results, participants, victims, and methods of commission and otherwise are interrelated by distinguishing characteristics and are not isolated events. Defendants' pattern of racketeering has continued over years as a continuing criminal activity since at least 2003.

## COUNT I - SUBSTANTIVE RACKETEERING UNDER 18 U.S.C. § 1962(c) (PETTERS, COLEMAN, WHITE, REYNOLDS, CATAIN)

38. By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

39. PETTERS, COLEMAN, WHITE, REYNOLDS, and CATAIN operated or managed the affairs of the Enterprise and have knowingly conducted and/or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5). Such racketeering activity consists of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon a scheme to defraud Lancelot of millions of dollars through the preparation and submission of scores of fraudulent

documents relating to the purchase and resale of merchandise through the United States mail. Further, their kickback scheme transported fraudulently-taken money that exceeded $5,000 in value across state lines with fraudulent intent in violation of 18 U.S.C. § 2314-15.

40. These predicate acts have the same or similar purposes, results, participants, victims, and methods of commission and otherwise are interrelated by distinguishing characteristics and are not isolated events. Further, Defendants' pattern of racketeering continued over years as a continuing criminal activity.

41. The activities of the Enterprise affect interstate commerce. The Enterprise had an ongoing organization over a period of years continuing to the present. The members of the Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its purpose. Specifically, the Enterprise had an identifiable structure with each member and entity fulfilling a specific role to carry out and facilitate its business of buying and reselling merchandise such as electronics equipment among its members and to others in interstate commerce.

42. Lancelot has been directly injured in its business and property by reason of Defendants' intentional, wanton, and malicious conduct in that Lancelot has loaned in excess of one billion dollars to THOUSAND LAKES. Some of these funds have been unlawfully converted to the personal use and benefit of the individual defendants.

43. By reason of their injury and damages, Plaintiffs are entitled to treble damages, punitive damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and any other relief the Court deems just and proper.

## COUNT II - RACKETEERING CONSPIRACY UNDER 18 U.S.C. § 1962(d)
### (RICO DEFENDANTS)

44. By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

45. Since the mid-1990's, the RICO DEFENDANTS willfully combined, conspired, and agreed with one another and with others to violate 18 U.S.C. § 1962(a),(c); that is, to knowingly facilitate, conduct and/or participate, directly or indirectly, in the conduct of the affairs of the Enterprise, the activities of which were conducted through a pattern of racketeering activities which are described above, and agreed with one another that someone would commit at least two predicate acts to accomplish the goals of this conspiracy, all in violation of 18 U.S.C. § 1962(d).

46. The object of this conspiracy was to violate the RICO statute, as described in Count I above, by participating in a pattern of racketeering activity to defraud Lancelot of money by means of mail and wire fraud and to transport knowingly in interstate commerce the funds stolen from Lancelot, which far exceeded a value of $5,000.

47. As a direct and proximate result of the RICO DEFENDANTS' conduct, Lancelot was injured in that it loaned in excess of $1 billion in connection with the pattern of racketeering activity described above.

48. By reason of this injury, Plaintiffs are entitled to recover treble damages, punitive damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III - BREACH OF CONTRACT
## (THOUSAND LAKES)

49. By this reference, Lancelot re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

50. The Loan Agreement is a valid and enforceable contract, and Lancelot is the successor to Granite's rights under the Loan Agreement.

51. Lancelot has performed all conditions and covenants on its part to be performed pursuant to the Loan Agreement with the exception of those conditions and covenants that may have been excused, or the performance of which was rendered impossible, by the conduct of the RICO DEFENDANTS.

52. THOUSAND LAKES breached the Loan Agreement by, among other things, not purchasing merchandise with the Loan proceeds, but using the Loan proceeds for the personal benefit of PETTERS, PCI and others, in violation of § 4.15; concealing and omitting to disclose material information concerning the RICO DEFENDANTS' fraudulent scheme, in violation of § 4.19; and failing to keep proper books and records, in violation of § 5.7.

53. As a result of the occurrence of these Events of Default, THOUSAND LAKES' obligations under the Master Loan Agreement have been accelerated and declared forthwith due and payable pursuant to § 7.2.

54. Despite demand, THOUSAND LAKES has failed to satisfy the amount of its outstanding obligations under the Loan Agreement.

55. As a direct and proximate result, Lancelot has suffered substantial, irreparable and ongoing injury and damages of at least $1 billion and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial.

### COUNT IV - BREACH OF CONTRACT
### (PETTERS, PCI)

56. By this reference, Lancelot re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

57. The Guaranty Agreements constitute valid and enforceable contracts between PETTERS, PCI, and Lancelot.

58. THOUSAND LAKES is in breach of the Loan Agreement and owes Lancelot in excess of $1 billion, thus triggering PETTERS and PCI's obligations under the Guaranty Agreements.

59. Despite Lancelot's demands for payment, PETTERS and PCI have failed to pay to Lancelot the aggregate amount of THOUSAND LAKES' liabilities owing to Lancelot, and, thus, are in breach of their obligations under the Guaranty Agreements.

60. As a direct and proximate result, Lancelot has suffered substantial, irreparable, and ongoing injury and damages in excess of $1 billion and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial.

## COUNT V - COMMON LAW FRAUD
## (PETTERS, THOUSAND LAKES, COLEMAN, WHITE)

61.   By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

62.   THOUSAND LAKES, PETTERS, COLEMAN, and WHITE made false representations to Lancelot in the Requests for Loans under the Loan Agreement. Specifically, as described above, the Requests for Loans falsely represented that, among other things, the Loans were for the sole purpose of making payment on attached purchase orders and invoices for particular merchandise to be sold to big box retailers. In fact, the funds were to be used to facilitate RICO DEFENDANTS' fraudulent scheme.

63.   Lancelot reasonably relied on THOUSAND LAKES, PETTERS, COLEMAN, and WHITE's representations to their detriment in advancing funds for Loans under the Master Loan Agreement beginning in or around October 2002.

64.   THOUSAND LAKES, PETTERS, COLEMAN, and WHITE's wanton, malicious, and intentional conduct directly and proximately caused substantial, irreparable, and ongoing injury and damages to Lancelot in an amount to be determined at trial.

65.   THOUSAND LAKES, PETTERS, COLEMAN, and WHITE acted with a deliberate disregard of Lancelot's rights under the Loan Agreement to receive information in connection with the Loan Agreement and Requests for Loans that was not materially misleading. THOUSAND LAKES, PETTERS, COLEMAN, and WHITE's conduct was wanton, malicious, intentional, and directed at Lancelot.

66. As a direct and proximate result, Lancelot has suffered substantial, irreparable and ongoing injury and damages in excess of $1 billion, and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial.

### COUNT VI - CONSPIRACY TO COMMIT FRAUD
### (RICO DEFENDANTS)

67. By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

68. By engaging in the conduct described above, the RICO DEFENDANTS agreed to assist THOUSAND LAKES, PETTERS, COLEMAN, and WHITE in their scheme to defraud Lancelot and acted in furtherance of that conspiracy to defraud.

69. The RICO DEFENDANTS acted with a deliberate disregard of Lancelot's rights. The RICO DEFENDANTS' conduct was wanton, malicious, intentional, and directed at Lancelot.

70. As a direct and proximate result, Lancelot has suffered substantial, irreparable, and ongoing injury and damages in excess of $1 billion, and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial.

### COUNT VII- UNJUST ENRICHMENT
### (PETTERS AND PCI)

71. By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein

72. PETTERS and PCI wrongfully retained the funds advanced by Lancelot through the unlawful conduct described above. As a result, PETTERS and PCI have been unjustly enriched at Lancelot's expense.

73. Allowing PETTERS and PCI to retain funds that were wrongfully obtained from Lancelot by fraud would violate the fundamental principles of justice, equity, and good conscience.

74. As a direct and proximate result, Lancelot has suffered damages in excess of $1 billion and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial.

### COUNT VIII - UNJUST ENRICHMENT
### (NIR, ENCHANTED, CATAIN AND REYNOLDS)

75. By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

76. NIR, ENCHANTED, CATAIN, and REYNOLDS wrongfully retained at least $50 million (5%) of the funding advanced by Lancelot as a kickback for their participation in the wrongful conduct described above. As a result, NIR, ENCHANTED, CATAIN, and REYNOLDS have been unjustly enriched at Lancelot's expense.

77. Allowing NIR, ENCHANTED, CATAIN, and REYNOLDS to retain funds that were wrongfully obtained from Lancelot by fraud would violate the fundamental principles of justice, equity, and good conscience.

78.     As a direct and proximate result, Lancelot has suffered damages of in excess of $1 billion and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial

## COUNT IX - CONVERSION
## (RICO DEFENDANTS)

79.     By this reference, Plaintiffs re-affirm, re-allege, and incorporate each and every allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

80.     Pursuant to the terms of the Loan Agreement and the Requests for Loans, PCI and THOUSAND LAKES were to use the Loans to purchase the merchandise described in the purchase orders attached to each Request for Loan.

81.     The RICO DEFENDANTS wrongfully and without authority assumed control, dominion, and ownership over the specific funds that were to be used for the purchase of merchandise pursuant to the Requests for Loans and diverted them for the benefit of themselves.

82.     The amount of the Loans intended for the purchase of merchandise is and was determinable at all times.

83.     Lancelot has an absolute and unconditional right to immediate possession of the funds advanced through the Loans that RICO DEFENDANTS kept for their own benefit.

84.     The RICO DEFENDANTS' failure to return the property to Plaintiffs is vexatious and without legal justification.

85.     The taking and conversion of the property by the RICO DEFENDANTS was done willfully and maliciously with a wanton disregard for Lancelot's rights in that they knew at

all times relevant herein that the Loans were intended and required to be used for the purchase of merchandise. Nonetheless, the RICO DEFENDANTS willfully and maliciously refused to return the property or reimburse Lancelot. Such conduct is sufficient to justify an award for punitive damages in addition to actual damages.

86. As a direct and proximate result, Lancelot has suffered damages in excess of $1 billion and has incurred, and continues to incur, further damages, legal fees, costs, and expenses in an amount to be determined at trial.

WHEREFORE, Plaintiffs hereby respectfully request that this Court enter an order and judgment in their favor and against defendants as follows:

(a) On Counts I and II, compensatory damages in excess of $1 billion, treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

(b) On Counts III and IV, compensatory damages in excess of $1 billion and all amounts recoverable under the applicable contracts, including attorney's fees and costs;

(c) On Counts V and VI, compensatory damages in excess of $1 billion;

(d) On Counts VII and VIII, a constructive trust for the benefit of Lancelot over bank accounts and other assets owned by the RICO DEFENDANTS in an amount equal to the funds wrongfully obtained and that the Court order such monies to be transferred and conveyed to Plaintiffs;

(e) On Count IX, a money judgment in the amount of all the monies wrongfully obtained from Lancelot in an amount to be proved at trial;

(f) On Count X, compensatory damages of at least $10 million, plus all amounts recoverable under the applicable contract, including attorney's fees and costs;

(g) On all Counts, pre- and post-judgment interest and costs, and any other relief the Court deems just and proper.

Dated: October 7, 2008

**BRIGGS AND MORGAN, P.A.**
ATTORNEYS FOR PLAINTIFFS
LANCELOT INVESTORS FUND, LP,
LANCELOT INVESTMENT
MANAGEMENT, LP,


By   s/ James J. Long
        James J. Long (#190858)
        Lindsey D. Saunders (#387990)
80 South Eighth Street
2200 IDS Center
Minneapolis, Minnesota 55402
Telephone:   (612) 977-8400
Facsimile:    (612) 977-8650

OF COUNSEL FOR LANCELOT
INVESTMENT MANAGEMENT, LP:

Stephen J. Senderowitz
Jeff J. Marwil
Kristen V. Grisius
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, Illinois 60601-9703
T: (312) 558-5600
F: (312) 558-5700